# In the United States Court of Federal Claims

## BID PROTEST

|  |  |  |
|---|---|---|
| PACIFIC ENGINEERING INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| THE UNITED STATES OF AMERICA, | ) | No. 25-1115C |
| Defendant, | ) | (Filed Under Seal: October 7, 2025 |
| and | ) | Reissued: October 23, 2025)* |
| BAE SYSTEMS LAND & ARMAMENTS L.P., | ) | |
| Defendant-Intervenor. | ) | |

Ryan C. Bradel, Ward & Berry, PLLC, Tysons, VA, for Plaintiff, with whom were Mary Pat Buckenmeyer, Aaron L. Jackson, P. Tyson Marx, and Nicholas L. Perry, Of Counsel.

Mariana Teresa Acevedo, William J. Grimaldi, Patricia M. McCarthy, and Brett A Shumate, U.S. Department of Justice Washington, DC, for Defendant, with whom was Eric M. Carlson, Naval Sea Systems Command, Washington, DC, Of Counsel.

Jeffery M. Chiow, Greenberg Traurig, LLP, Washington, DC, for Defendant-Intervenor, with whom were Eleanor M. Ross and Olivia C. Bellini, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge**

In this post-award bid protest, Plaintiff, Pacific Engineering, Inc. ("PEI"), challenges the decision of the Department of the Navy, Naval Sea Systems Command ("NAVSEA" or the "Agency" or the "Navy") to award Defendant-Intervenor, BAE Systems and Land Armaments

---

* This opinion was originally issued under seal, and the parties were given the opportunity to request redactions. The Plaintiff, Pacific Engineering Inc., did not request redactions. The government and the Defendant-Intervenor, BAE Land & Systems Land & Armaments L.P., requested a few unopposed redactions, which the Court has adopted.

L.P. ("BAE"), a contract to produce MK 41 Vertical Launching Systems ("VLS") canisters. The canister variant that is the subject of this protest is the MK 29. See AR Tab 5 at 67.

VLS canisters are used as missile shipping containers and launch tubes. See AR Tab 17a at 714. For the last thirty years, the Navy has awarded all its MK 41 VLS canister contracts to BAE, AR Tab 16 at 479, most recently on February 11, 2020, AR Tab 82 at 7822. In the NAVSEA's two most recent attempted competitive actions to procure the canisters, BAE was the only offeror. Id.

To address the problem of limited competition, the Navy conducted market research and adjusted the Solicitation in some respects, as explained below. Their efforts bore some fruit as three offerors submitted proposals in response to the Solicitation at issue here: PEI, BAE, and [* * *]. Still, NAVSEA ultimately awarded the canister contract to BAE again, finding its proposal represented the best value to the government.

PEI challenges the award to BAE on several related grounds. Its central contention is that NAVSEA's decision to assign four weaknesses to PEI's technical proposal was arbitrary and capricious and reflected disparate treatment. Pl.'s Mot. for J. on the Admin. Rec. ("MJAR") at 8–22, ECF No. 37. Therefore, PEI contends, the relatively low adjectival ratings assigned to its proposal ("Marginal" based on its technical approach and presenting a "Moderate" performance risk) were unjustified. Id. at 22–25. In addition, PEI claims the discussions the Agency held with it regarding the four weaknesses were not meaningful and that the result of the Agency's approach to PEI's proposal was to effectively convert the procurement into a de facto sole source acquisition. Id. at 25–36.

On September 30, 2025, the Court ruled on the parties' cross-motions for judgment on the administrative record, denying PEI's motion and granting the motions of the government and BAE. ECF No. 52. What follows is an explanation of that ruling.

## **BACKGROUND**

### I.    The Solicitation

On May 30, 2023, the Navy issued Solicitation No. N00024-23-R-5324 (the "Solicitation" or "RFP"). See AR Tabs 17–17zf. It contemplated the award of a firm fixed price contract, on a best value basis, to "fabricate, assemble, inspect, test, and deliver the VLS Canister and associated equipment in accordance with technical drawings and specifications identified in the Statement of Work." AR Tab 17a at 716. The Solicitation was amended six times, making changes in response to bidder's questions and extending the proposal submission dates. See AR Tabs 18–24.

As noted, to increase competition, NAVSEA conducted market research as part of the planning process for the procurement. It gathered feedback from industry by issuing a Request for Information, and it held several industry events. See AR Tabs 2–4, 6, 9–11.

The feedback the Agency received resulted in several changes to its procurement strategy. Foremost among these was the Agency's decision to split the Solicitation into three parts based on canister type: steel (0xxx series), quad pack steel (1xxx series), and composite

(2xxx series). AR Tab 3 at 53; AR Tab 13 at 463; AR Tab 14 at 470. This change gave offerors the option of submitting proposals for any one canister type, or for all of them. AR Tab 16 at 484.

PEI's protest concerns the Agency's decision to award the contract to produce the 2xxx composite canister series. AR Tab 24a at 2713–26, 2812. The other contract awards are not at issue in this action.

### A.     <u>Evaluation Criteria</u>

The Solicitation provided NAVSEA would evaluate proposals by reference to three factors: Technical Approach and Production Capability (Factor 1); Past Performance (Factor 2); and Total Evaluated Price ("TEP") (Factor 3). <u>Id.</u> at 2828. The Agency reserved the right to conduct discussions in accordance with FAR 15.306. <u>Id.</u> at 2815. After any discussions the Agency decided to hold, it would request Final Proposal Revisions ("FPRs") from all offerors within the competitive range. <u>Id.</u>

### 1.     **Factor 1: Technical Approach and Production Capability**

Technical Approach and Production Capability covered five elements: Production in Accordance with the Technical Data Package ("TDP") (Element 1); First Article Qualification Testing and Factory Acceptance Testing (Element 2); Facility and Tooling (Element 3); Quality Assurance Approach (Element 4); and Program Management (Element 5). <u>Id.</u> at 2821–22, 2828. The evaluation of the parties' proposals under Elements 1, 3, and 5 are relevant to the present protest.

Under Element 1, the Solicitation required offerors to provide a manufacturing plan that included an Integrated Master Plan, Integrated Master Schedule, and a Work Breakdown Structure. <u>Id.</u> at 2821. Offerors were instructed to demonstrate their technical approach and production capability to perform the contract in accordance with the delivery schedule. <u>Id.</u> The RFP also stated that the manufacturing plan should identify any risks and the offerors' approach to managing those risks. <u>Id.</u>

Under Element 3, offerors were instructed to "describe the proposed production assets, test assets, and capital assets in sufficient detail as to demonstrate adequate infrastructure, capability, and capacity for the production and test of the proposed canisters at the production rates that result in on-time delivery." <u>Id.</u> The Solicitation directed that they "specifically discuss" both the "availability of assets during the contract period of performance" and their "ability to mitigate the risk of a major equipment failure impacting schedule." <u>Id.</u>

Finally, under Element 5, the Solicitation dictated that proposals "describe [an offeror's] program management approach for staffing, subcontractor management, production planning, and communications with the Government." <u>Id.</u> at 2822. The staffing plans were to demonstrate how the offeror would provide the resources needed to execute the contract as well as the experience of the planned engineering staff in "first article inspection, fault isolation, failure analysis, source qualification, and test equipment design for military systems used in a United States Department of Defense or allied country military production program." <u>Id.</u>

The Solicitation explained NAVSEA would assign proposals adjectival ratings based on their evaluation under Factor 1. Id. at 2828. Those ratings would be based on "an assessment of compliance with the solicitation requirements and merit" and would consider the benefits and detriments related to each proposal. Id. The Solicitation further stated: "The degree of benefit to the Government associated with a strength(s) will be considered in determining whether the Offeror's approach and understanding of requirements rises to a level exceeding requirements to the advantage of the Government during contract performance." Id.

Proposals could receive one of five adjectival ratings under Factor 1: Outstanding, Good, Acceptable, Marginal, and Unacceptable. Id. at 2831 tbl. M-1. An "outstanding" rating would be assigned to a proposal that demonstrated "an <u>exceptional</u> approach and understanding of the requirements" and contained "multiple strengths and/or at least one significant strength." Id. (emphasis added). A "good" rating would be assigned under Factor 1 to a proposal that demonstrated "a <u>thorough</u> approach and understanding of the requirements" and contained at least one strength or significant strength. Id. (emphasis added). A proposal that demonstrated "an <u>adequate</u> approach and understanding of the requirements" would be given an "acceptable" rating, but one that did not demonstrate such an adequate approach and understanding would receive a "marginal" rating. Id. (emphasis added). A proposal that did not meet the requirements of the Solicitation, and therefore contained one or more deficiencies, would be rated "unacceptable" and would be considered "un-awardable." Id. Finally, the Solicitation stated that a proposal was "not required to have all of the attributes of the rating definitions . . . to be eligible for the rating adjective specified." Id.

The Solicitation instructed that the Agency would assign one of four adjectival ratings to represent the degree of risk presented by an offeror's proposal under Factor 1: low risk, moderate risk, high risk, or unacceptable. See id. at 2832 tbl. M-2. These ratings would be based on an assessment of the proposal's weaknesses, the potential that these weaknesses could "cause disruption of schedule, increased cost, or degradation of performance," and the extent to which contractor emphasis and government monitoring would "likely be able to overcome any difficulties." Id.

The Solicitation also outlined the Agency's standards to assess a proposal's strengths and weaknesses under Factor 1. Id. at 2833. A weakness would be assigned when the proposal contained a "flaw . . . that increase[d] the risk of unsuccessful contract performance," and a "significant weakness" would be assigned to a flaw that "appreciably" increased that risk. Id. A strength would be assigned where there was an aspect of the proposal that had merit or would "exceed specified performance or capability requirements to the advantage of the Government during contract performance." Id. A "significant strength" would be assigned where an aspect of the proposal had "appreciable" merit or would exceed performance or capability requirements to the "considerable advantage" to the government. Id.

## 2.    Factor 2: Past Performance

The second evaluation factor was Past Performance. The RFP specified that the Agency would use information an offeror provided, "as well as any other information deemed necessary . . . to assess the Offeror's ability to meet the solicitation requirements." Id. at 2829. The Agency would consider both the recency and relevancy of an offeror's past performance data along with its proposed subcontractors' past performance. Id.

An acceptable rating would be assigned when, "[b]ased on the Offeror's performance record, the Government has a reasonable expectation that the Offeror will successfully perform the required effort, or the Offeror's performance record is unknown." Id. at 2831. In accordance with FAR 15.305(a)(2)(iv), an offeror without a record of relevant past performance or for whom information on past performance is not available would automatically be rated acceptable. Id. The Solicitation further explained that if the Agency determined a proposal was unacceptable under Past Performance, it could eliminate the proposal from further consideration without evaluating the proposal based on any other factor. Id. at 2833.

### 3.    Factor 3: Total Evaluated Price

For its evaluation of the third factor, the Agency would calculate a TEP for the base award and each option year using the firm-fixed price for each contract line-item number ("CLIN") and applying the appropriate stepladder quantities. Id. at 2828–30. The Solicitation provided that the Agency would not conduct either a price realism or cost realism analysis. Id. at 2829.

### B.    Award Criteria

The Solicitation stated the government intended to award up to three contracts to the offeror or offerors whose proposals represented "the best value to the Government based on consideration of the evaluation factors outlined in [the] solicitation." Id. at 2830. The Agency would select a proposal that met the Solicitation's requirements and was "the most advantageous to the Government, considering all of the evaluation factors." Id.

An offeror's Technical Approach would be afforded weight approximately equal to that afforded to TEP, and Past Performance needed only be rated acceptable. Id. at 2828. The Solicitation provided that the government could accept a higher-cost proposal where it determined a proposal's perceived benefits "merit the additional cost." Id. at 2830. "Conversely," it stated, "the Government may select a lower-cost, lower rated proposal(s) if the Government determines that the premium associated with the higher-rated proposal is not justified." Id.

### C.    Evaluation and Award Procedure

Under the Source Selection Plan ("SSP"), the Source Selection Evaluation Board ("SSEB") was responsible for evaluating proposals under Factors 1 and 2. See AR Tab 16 at 514; see also AR Tab 82 at 7828 (describing the SSEB as "comprised of Navy technical experts with substantial experience in the tasks required by the solicitation"). The Price Analysis Team ("PAT") would evaluate Factor 3 and calculate the TEP. See AR Tab 82 at 7828. The SSEB and PAT would supply the Source Selection Advisory Council ("SSAC") with reports describing the results of their evaluations. Id. The SSAC would review the reports and then make an award recommendation to the Source Selection Authority ("SSA"), who would make the final award decision. See id. at 7828–29.

## II.    The Evaluations of the Proposals

On September 19, 2023, the Agency received timely proposals from BAE, PEI, and [* * *]. See AR Tabs 25a–25f (BAE proposal); AR Tabs 26a–26d7 (PEI proposal); AR Tabs 27a–27d9 ([* * *] proposal). NAVSEA opened discussions with the offerors on June 14, 2024.

See generally AR Tabs 30–34c. Each offeror submitted their answers to the discussion questions along with revised proposals on July 1, 2024. AR Tabs 30–30g (BAE); AR Tabs 32–32b (PEI); AR Tabs 34–34c ([* * *]).

During the first week of December 2024, the Agency notified all three offerors that discussions had ended and their proposals were within the competitive range. See AR Tabs 35–37. As directed, each offeror timely provided FPRs on December 20, 2024. See AR Tabs 42a–42h (BAE); AR Tabs 43a–43l (PEI); AR Tabs 44a–44c ([* * *]).

### A.    PEI's Proposal

At the outset of the discussion period, NAVSEA informed PEI that its initial proposal included: one weakness and three significant weaknesses within Element 1; two significant weaknesses within Element 3; and two significant weaknesses and a deficiency within Element 5. AR Tab 31a. It posed questions to PEI regarding the weaknesses it had identified. Id. PEI provided responses to the Agency's discussion questions on July 1, 2024, see AR Tabs 32–32b, and submitted its FPR on December 20, 2024, AR Tabs 43a–43l.

The SSEB's evaluation of PEI's FPR was significantly more favorable than NAVSEA's evaluation of PEI's initial proposal. The Agency identified seven significant weaknesses and a deficiency in the initial proposal, AR Tab 31a, but found no significant weaknesses or deficiencies in PEI's FPR, AR Tab 54.

The SSEB nonetheless concluded that PEI's FPR still included four weaknesses: one each under Elements 1 and 5, and two under Element 3. AR Tab 54 at 6621–25. The SSEB also found that PEI's proposal included three strengths, including one under Element 1 and two under Element 2. Id. at 6621–23. Based on these findings, the SSEB assigned PEI's final proposal an adjectival rating of "Marginal" for Factor 1 and determined that it presented a "Moderate" risk. Id. at 6620. The SSAC concurred with these ratings. AR Tab 57 at 6672.

The SSEB found that the information PEI provided for past performance was "sparse" and so "a meaningful past performance rating cannot be reasonably assigned." AR Tab 54 at 6620, 6626–27. Therefore, in accordance with the RFP and FAR 15.301(a)(2)(iv), it rated PEI's proposal acceptable under Factor 2. Id.

### B.    BAE's Proposal

During the discussion period, NAVSEA informed BAE that its initial proposal had one weakness under Element 1. AR Tab 28a. The SSEB assessed the weakness because BAE's proposed Integrated Master Schedule did not show the correct total delivery requirements or the correct monthly delivery rates for CLIN 2xxx canisters as required. See id. BAE responded to NAVSEA's request that it address this discrepancy on July 1, 2024. AR Tab 30a at 4117; see also AR Tabs 30–30g. It submitted its FPR on December 20, 2024. See AR Tabs 42a–42h.

The SSEB determined that BAE's FPR adequately addressed the concern the Agency raised. It concluded that BAE's FPR included sixteen strengths, seven of which it dubbed "significant." AR Tab 53 at 6605. Specifically, the SSEB found three significant strengths and one strength within Element 1, two significant strengths within Element 2, two significant

strengths and three strengths within Element 3, three strengths within Element 4, and two strengths within Element 5. Id. at 6605–12. It further found that BAE's proposal contained no weaknesses, significant weaknesses, or deficiencies. Id. at 6605.

Overall, the SSEB assigned BAE's FPR an "outstanding" rating under Factor 1. Id. It assessed the risk of BAE's proposal as "Low." Id. Under Factor 2, the SSEB rated BAE's past performance as "acceptable," finding "a reasonable expectation the Offeror will successfully perform the required effort" based on at least three prior contracts, including the prior two procurements for the same missile canisters. See id. at 6613–14. The Agency found that in every aspect of performance, BAE's relevant and recent performance was at least "Marginal" and otherwise "Satisfactory" or "Very Good." See id. at 6616. The SSEB further found that BAE's seven major subcontractors also had relevant past performance. Id. at 6613–15.

### C.    [* * *]'s Proposal

During the discussion period, NAVSEA informed [* * *] that its initial proposal contained eight weaknesses, one of which was characterized as "significant." See AR Tab 33a. Specifically, [* * *]'s initial proposal had four weaknesses within Element 1, one weakness within Element 2, and two weaknesses and one significant weakness within Element 3. Id.

[* * *] submitted an amended proposal and responded to the discussion questions on July 1, 2024. AR Tabs 34–34c. It then submitted an FPR on December 20, 2024. AR Tabs 44a–44c.

The SSEB concluded that [* * *]'s FPR contained six strengths, none of which it characterized as significant, and that it had no weaknesses or deficiencies. AR Tab 55 at 6630. Specifically, the SSEB assessed one strength within Element 1, one strength within Element 3, three strengths within Element 4, and one strength within Element 5. Id. at 6631–34. It assigned [* * *] an adjectival rating of "Good," and determined that its proposal presented a "Low" risk of unsuccessful performance. Id. at 6630.

Under Factor 2, the SSEB rated [* * *]'s past performance as "Acceptable," finding "a reasonable expectation that the offeror will successfully perform the required effort." Id. at 6635.

## III.    Award Decision

The SSAC "independently reviewed, concurred with, and adopted all of the analysis documented in the SSEB and PAT reports." AR Tab 57 at 6672. The results of those analyses for Factor 1, described above, as well as each offeror's TEP, are reflected in the table below:

| Evaluation Factor | Rating Type | BAE | PEI | [* * *] |
|---|---|---|---|---|
| Factor 1: Technical Approach and Production Capability | Adjectival | Outstanding | Marginal | [* * *] |
| Factor 2: Past Performance | Acceptable/ Unacceptable | Acceptable | Acceptable | [* * *] |
| Factor 3: TEP | *** | $220,951,805 | $187,201,899 | $[* * *] |

Id.

The SSAC recommended that the contract be awarded to BAE. Id. It concluded that BAE's approach under Factor 1 was superior to the approaches of both PEI and [* * *]. See id. at 6679–89. And it found that although BAE's TEP was approximately 18% higher than PEI's, the price premium was justified by the "unique benefits" and less risky nature of BAE's proposal. See id. at 6690–92. The SSAC opined that the risks PEI's proposal presented were "too great when compared to BAE's approach in Factor 1," reasoning that "failure to deliver the MK 29 canister on time[] may have an adverse impact on missile deliveries that could impact the missile production line and/or jeopardize ship and personnel safety." Id. at 6692.

The SSA agreed with the SSAC recommendation and awarded the contract to BAE. See AR Tab 58 at 6694–96; see also AR Tabs 59, 62. The SSA stated that she evaluated each of the proposals and reviewed the reports of the SSAC, SSEB, and PAT. AR Tab 58 at 6694. She "adopt[ed] in whole the [SSAC's] analysis and conclusions." Id. "In summary, based on [her] integrated assessment of all proposals in accordance with the specified evaluation factors, it [was] her] decision that BAE's proposal for the 2xxx CLIN Series offer[ed] the best value." Id. at 6696.

## IV.    Debriefing and Agency Level Protest

The offerors were notified on April 29, 2025, that BAE had been awarded the contract. AR Tabs 59–61. On May 6 and 16, 2025, the Agency provided BAE, PEI, and [* * *] with debrief letters in accordance with FAR 15.506(b). AR Tab 65 (BAE); AR Tab 68 (PEI); AR Tab 73 ([* * *]). The offerors were also provided with redacted versions of the reports of the SSEB, the PAT, the SSAC, and the SSA. AR Tabs 65a–65d (BAE); AR Tabs 68a–68d (PEI); AR Tabs 73a–73d ([* * *]). PEI submitted written questions on May 8, 2025, AR Tab 69, to which the Agency responded on May 15, 2025, AR Tab 70.

The next day (May 16) PEI filed an agency-level protest. AR Tabs 75–79r. NAVSEA issued a stop-work order on May 19, 2025, while it considered the bid protest, pursuant to FAR 52.242-15. AR Tab 80. NAVSEA then denied the protest in its entirety on June 20, 2025. AR Tabs 81–82; see also AR Tabs 82a–82p.

## V.    This Action

PEI filed a complaint in this court on July 2, 2025. Compl., ECF No. 1; see also Redacted Compl., ECF No. 27. The Court granted BAE's motion to intervene on July 7, 2025, ECF No. 9. With the consent of the parties and leave from this Court, PEI filed an amended complaint on August 1, 2025. Am. Compl., ECF No. 34; see also Redacted Am. Compl., ECF No. 38.

Briefing on the cross-motions for judgment on the administrative record was completed on September 2, 2025. See ECF Nos. 48, 49. The Court heard oral argument on September 18, 2025. See Order, ECF No. 50.

**DISCUSSION**

I.    **Motions for Judgment on the Administrative Record**

The court reviews bid protests based on the existing administrative record. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed Cir. 2009); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). Parties may move for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). The court's inquiry in ruling on such a motion is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018)). Unlike a summary judgment proceeding, genuine issues of material fact do not foreclose the entry of judgment on the administrative record. Bannum, 404 F.3d at 1356.

II.    **Standard of Review**

Agency procurement decisions are subject to judicial review under the same standards as those used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). "In a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013); see also 5 U.S.C. § 706(2)(A).

This "highly deferential" standard of review requires a reviewing court to "sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). The Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). The court's review is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa, 238 F.3d at 1332–33 (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action").

Under this narrow standard of review, a protestor "bears a heavy burden." See Impresa, 238 F.3d at 1338. For an agency to prevail, it need only articulate a "rational connection between the facts found and the choice made," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (first quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962); and then quoting Bowman Transp., 419 U.S. at 286). Thus, the agency's action will only be set aside when the court is persuaded the agency either "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or [made a decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id.

### III.    PEI's Challenge to the Agency's Assignment of Four Weaknesses to Its Proposal

PEI challenges as arbitrary and capricious NAVSEA's identification of four weaknesses in the technical approach set forth in its proposal. It also contends that the Agency afforded disparate treatment to PEI's proposal as compared to BAE's and failed to conduct meaningful discussions with PEI regarding the weaknesses it assigned. Each of these challenges lacks merit.

#### A.    **Factor 1, Element 1: Proposed Approach to Producing MK 29 Laminate**

##### 1.    **Assignment of Weakness**

The SSEB identified one weakness in PEI's proposal for Factor 1, Element 1: Production in Accordance with the TDP. AR Tab 54 at 6621–22. PEI planned to produce MK 29 laminate itself in-house. AR Tab 43c at 6117–19.[1] However, when PEI submitted its proposal, only two companies were approved sources for the laminate: [* * *]. AR Tab 43c at 6117, 6185.[2] Before it could produce the laminate, PEI would have to secure approval to do so in accordance with the TDP. See id. at 6117.

The SSEB found PEI's plan risky. AR Tab 54 at 6622. PEI had not previously produced laminate and, lacking prior approval, it was possible that PEI's manufacturing process would not pass muster under the TDP, or at least that it might take some time for it to secure approval. Either way, PEI's proposal to produce the laminate in-house posed a risk that it would not be able to meet the required canister delivery schedule. Id.

The SSEB further found PEI provided insufficient detail in its proposal to show that it had an adequate contingency plan which could be put into effect on time if it was ultimately found not qualified to produce the laminate itself or if the approval was delayed. Id. PEI's proposal stated that it had contacted both the approved sources and that "[b]oth vendors said they would be willing to become a source of MK 29 Laminate Shells to [PEI] should [it] be awarded this contract." AR Tab 43c at 6117. PEI also stated its intent "to order a large enough quantity of material after the contract award to fabricate the shell structures which could also be provided to one (or both) of these approved sources to mitigate schedule impacts if the need [arose]." Id.

But the proposal did not state that PEI's contacts with the approved sources had resulted in binding commitments to supply laminate to PEI if it became necessary. See id. It merely indicated that the sources had been contacted and "would be willing" to do so. Id. The SSEB

---

[1] In addition to serving as transporting and launching devices, the canisters provide environmental protection, structural support, hazard monitoring, and rocket motor exhaust containment. AR Tab 5 at 70. Accordingly, the shell structures must contain a laminate protective covering. See generally AR Tab 43c at 6107–11.

[2] The Technical Data Package drawing for MK 29 laminate (Drawing No. 8407532) is a source-controlled drawing. See, e.g., AR Tab 54 at 6622. The Navy will only accept MK 29 canisters with laminate made by companies who have passed its qualification tests. See id.

found the proposal contained insufficient detail concerning when an approved source would need to be brought on board to meet the delivery requirements of the Solicitation. AR Tab 54 at 6622. And PEI did not explain how long it would take it to deliver the laminated shells once it engaged either [* * *], nor did it discuss how long it could wait to secure approval to produce the laminate in-house before engaging an approved source. See AR Tab 43c at 6117–19.

The SSEB also found that whether either approved source would accept the material PEI procured, as contemplated in PEI's proposal, created additional performance risk. AR Tab 54 at 6622. In short, the SSEB reasoned, "[PEI's] proposed approach to MK 29 laminate increases risk of unsuccessful contract performance because performance issues/delays would result in late delivery to the Fleet." Id. Because the approach contained what the SSEB considered "a flaw . . . that increase[d] the risk of unsuccessful contract performance," AR Tab 24a at 2833, it assigned PEI's proposal a weakness under Element 1.

PEI argues the SSEB unreasonably determined that it had not provided enough detail about the nature of any arrangements with [* * *] or its contingency plans generally. Pl.'s MJAR at 9. In fact, PEI argues, NAVSEA "entirely failed to understand" its proposal and provided only conclusory statements to explain its assessment. Id. at 9–10.

These arguments are without merit. The SSEB report did not rely on conclusory statements in explaining its assessment of a weakness in PEI's proposal under Factor 1, Element 1. It based the assignment of a weakness on the facts that: (1) PEI was not an approved source of the laminate and would need to pass the NAVSEA qualification process to secure such approval; (2) PEI's proposal lacked detail about when the approved sources would be able to step in if PEI did not receive approval; and (3) the proposal lacked detail about whether the approved sources would accept the material PEI said that it would procure to mitigate scheduling impacts.

The Agency's determinations regarding the risks presented by this aspect of PEI's proposal and the extent to which the risks were worth bearing are entitled to significant deference. See E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) ("[T]echnical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."). Further, the failure to produce the canisters on time could have significant adverse consequences from a national security perspective. The canisters are contracted for separately from the missiles they will ultimately hold and potentially launch. See AR Tab 57 at 6691. The canisters must be available to allow for final acceptance of the missiles. Id. If the missiles are produced and the canisters are not ready, production of the missiles may need to be shut down and, in addition, the integrity of the missiles may be at risk. Id. As the SSAC explained, "[o]n-time delivery of the MK 29 canister is critical to ensuring ship survivability and avoid loss of life." Id. The Court concludes, therefore, that the Agency's determinations that PEI's plan to manufacture the laminate itself was too risky and that PEI did not have a reliable backup plan, were neither arbitrary and capricious, nor contrary to law.

### 2. Unstated Evaluation Criteria

There is also no merit to PEI's argument that NAVSEA applied unstated evaluation criteria when it found that PEI failed to provide sufficient detail about its contingency plans. PEI observes that the RFP did not require what it calls "hyper detail"; nor did it require PEI to "describe ad nauseum the decision-making process for this redundancy feature." Pl.'s MJAR at

11. However, the Solicitation did state that proposals "must contain a complete description of all pertinent aspects of the effort proposed by the Offeror" and "must also identify and evaluate any risks associated with the Offeror's proposed approach and propose mitigation steps to minimize the Government's risk." AR Tab 24a at 2620, 2628. It also stated that "[e]ach Offeror is required to submit a proposal that is sufficiently detailed and complete to fully demonstrate an understanding of, and compliance with, all of the requirements of the solicitation." Id. at 2620. The Agency's decision to assign PEI's proposal a weakness because of a lack of sufficient detail was in accord with these requirements in the Solicitation.

### 3.    Disparate Treatment

Similarly without merit is PEI's assertion that it was the victim of disparate treatment with respect to the Agency's evaluation of its proposal under Factor 1, Element 1. To be sure, agencies are required to treat offerors "fairly and impartially." Off. Design Grp. v. United States, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (citing FAR 1.602-2(b)); see also FAR 1.602-2(b) ("Contracting officers shall . . . [e]nsure that contractors receive impartial, fair, and equitable treatment."). Therefore, an agency must evaluate proposals in an even-handed fashion.

However, the FAR expressly states that dissimilar proposals "need not be treated the same." FAR 1.102-2(c)(3). And the court of appeals has held that to establish that an agency has afforded two proposals disparate treatment, a protestor must show "that the agency unreasonably downgraded [the protestor's] proposal for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." Off. Design Grp., 951 F.3d at 1372 (citations omitted).[3]

PEI contends NAVSEA engaged in disparate treatment when it awarded BAE a significant strength under Factor 1, Element 1, where its proposal involved [* * *], while assigning PEI a weakness for a proposal that indicated that PEI had a backup plan that would similarly allow it to procure laminate from either [* * *] or from [* * *]. Pl.'s MJAR at 9–10. But the components of BAE's proposal that were the basis for the SSEB's assignment of a strength and the components of PEI's proposal to which the SSEB assigned it a weakness are too different to support a disparate treatment claim.

PEI's proposal involved in-house production of the laminate with a backup plan based on an expression of "willingness" on the part of [* * *] to supply the laminate if PEI was not approved to do so. On the other hand, the Agency awarded BAE a significant strength under Element 1 because BAE had subcontracts with approved sources and also because it "proposed to use [its] proven approach and capabilities to produce canisters in accordance with [] the TDP for the [Navy]." AR Tab 53 at 6606.

PEI's overall approach and capabilities were thus different from BAE's, and they were not "proven" in the context of the production of these canisters. Moreover, while BAE proposed

---

[3] An offeror may also demonstrate disparate treatment by proving "that the agency inconsistently applied objective solicitation requirements between [the protestor] and other offerors, such as proposal page limits, formatting requirements, or submission deadlines." Off. Design Grp., 951 F.3d at 1372 (citations omitted). PEI does not argue that this prong of Office Design Group is at issue in this protest.

to rely on established contractual arrangements with approved laminate suppliers, PEI proposed to produce the laminate in-house and had no commitments from approved suppliers.

In short, the proposals were not substantially indistinguishable. A comparison of the Agency's evaluation of the proposals may therefore not form the basis for a disparate treatment claim.

### 4.    Meaningful Discussions

PEI also argues that the Agency failed to conduct meaningful discussions regarding the weakness it assigned PEI under Element 1. This contention lacks merit.

An agency is not required to conduct discussions. But where, as here, it decides to do so, the discussions must be meaningful and not misleading. The agency must, "at a minimum" "indicate to, or discuss with'" offerors "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." FAR 15.306(d)(3). An agency must not "misdirect the protestor as it revises its proposal." RMGS Inc. v United States, 140 Fed. Cl. 728, 741 (2017) (quoting Greenland Contractors I/S v. United States, 131 Fed. Cl. 216, 225 (2017)). "However, the contracting officer is not required to discuss every area where the proposal could be improved." FAR 15.306(d)(3). To the contrary, "[t]he scope and extent of discussions are a matter of contracting officer judgment." Id.

PEI contends that, during the discussion period, NAVSEA did not alert it to the Agency's concern about its ability to meet the canister delivery schedule because it was not an approved source for the MK 29 laminate. Pl.'s MJAR at 26–27 (quoting AR Tab 54 at 6622). This contention is demonstrably inaccurate. When NAVSEA initiated discussions, it advised PEI in writing that its proposal had a weakness "in that there is a risk to meeting the required canister delivery schedule if the MK 29 shell structure assembly does not pass the qualification requirements." AR Tab 31a at cell G3. Further, the Agency expressly told PEI that "failure of th[e] qualification test will increase the risk of unsuccessful contract performance." Id. And in its discussion questions, NAVSEA specifically asked PEI to "address the lack of contingency in case of PEI failing to pass the qualification requirements." Id. at cell H3.

PEI responded that its "contingency plan" would be to "negotiate the supply of composite shell structures from one or both of the currently approved sources" and that it intended to provide "pre-preg" material to the "approved sources to mitigate delivery schedule impacts." AR Tab 32 at 4868. It also pledged to "continue to troubleshoot and resolve any issues related to [its] in-house fabrication of composite shell structures." Id.

NAVSEA subsequently notified PEI that this response did not assuage its concerns. See AR Tab 36 at 5463. In its December 2024 request for final proposal revisions, the Agency observed that PEI did not then have quotes from either of the approved sources and still had not provided the details of the lead time for supply from these sources. Id. In other words, the Agency provided PEI with a second chance to address its concerns. PEI, however, did not do so. Its final proposal contained no information about any arrangements it had made with the two sources as to cost, materials, timing, or any other firm commitment. See AR Tab 43c at 6117. Rather, it simply offered a vague assurance that "both vendors said they would be willing to become a source of MK 29 Laminate Shells to [PEI] should [it] be awarded this contract." Id.

PEI's contention that the Agency did not conduct meaningful discussions about this aspect of its proposal therefore lacks merit.

### B.     Factor 1, Element 3 (Facility and Tooling): Equipment Generally

#### 1.     Assignment of Weakness

As noted above, under Factor 1, Element 3 (Facility and Tooling), offerors were instructed to describe their capital and non-capital assets "in sufficient detail as to demonstrate adequate infrastructure, capability, and capacity for the production and test of the proposed canisters at the production rates that result in on-time delivery." AR Tab 24a at 2821. They were also directed to "specifically discuss" both the "availability of assets during the contract period of performance" and their "ability to mitigate the risk of a major equipment failure impacting schedule." Id.

The SSEB assigned two weaknesses to PEI's proposal under Element 3. The first arose out of the fact that at the time it submitted its proposal, PEI did not yet possess or have access to some of the major equipment it would need to perform under the contract. AR Tab 54 at 6623–24. In fact, the SSEB observed, as of the time PEI submitted its final proposal in December 2024, some of the equipment had not even been ordered and would not be ordered, much less installed, until months after the contract award. Id. (citing AR Tab 43c at 6136–37 tbls. 2–3).

The SSEB was aware that PEI had met with vendors and discussed terms for purchasing equipment. Id. at 6623. Nonetheless, it observed, "until formal purchase orders are signed, terms and conditions can change." Id. Further, it noted, "[w]ithout a terms sheet or evidence from the vendors that the terms PEI was told are valid and would be honored, there is a performance risk these terms may change, which could jeopardize on-time delivery." Id. at 6623–24.

The SSEB concluded that, together, the volume of unordered equipment and PEI's proposed timeline regarding when it would order presented "a questionable approach that results in performance risk." Id. at 6623; see also AR Tab 57 at 6685 (SSAC Report observing that the weakness had been assigned based on "the volume of important equipment planned but not yet in [PEI's] possession including wind mandrels 1,[]2, and 3; mandrel transport cart; lathe (Fryer ET-80); HAAS 1250; Ultrasonic Inspection System, 5-Axis water jet; and bonding fixtures"). The Agency reasoned that the risks presented by delayed delivery of equipment and/or failures of the newly-installed equipment "could jeopardize on-time delivery" of the MK 29 canisters. AR Tab 54 at 6623; see also AR Tab 57 at 6685 (observing that "[i]f issues with equipment occur that impact when the machines could be used to support production of the canister or if there are delays in receiving the machinery, it could impact on-time delivery of canisters").

PEI contends that—in assessing this weakness—NAVSEA "mischaracterize[ed]" its proposal. Pl.'s MJAR at 14. It asserts its proposal made "clear" that it "possessed the full capability to provide all aspects of this project, both through independent manufacturing and the redundant option of ordering the laminate through two outside, approved sources." Id. (citing AR Tab 43c). It also contends that "[t]he other capital and non-capital expenditures identified by PEI bolstered existing capabilities." Id. at 15 (citing AR Tab 43c at 6135–37). It further claims its

"proposal showed that, if awarded the contract, additional capital purchases would be in place to ensure all redundancies were fully available." Id. at 14 (citing AR Tab 43c at 6135–37).

The weakness assessed with respect to PEI's plan to produce the laminate in-house is addressed above. Its assertions that the additional equipment acquisitions contemplated under its proposal merely "bolstered existing capabilities" are not supported by the proposal's language. The portion of the proposal PEI cites does not reflect that PEI already possessed or had access to the equipment required to complete performance on the contract. In fact, it implies the opposite. As PEI's proposal states, Table 2 (Major Capital Equipment) and Table 3 (Non-Capital Equipment) "address[] ordering, delivery, installation and training for capital equipment and noncapital equipment respectfully <u>needed</u> to support the MK 29." AR Tab 43c at 6136 (emphasis added). The Agency went on to say that "PEI has moved up order dates for the equipment to ensure installation and training can be conducted sooner to reduce risks to the MK-29 schedule." Id. Given this language, the Agency reasonably concluded that the acquisition of the equipment was necessary to perform on the contract and not merely proposed to bolster PEI's existing capabilities.

Finally, PEI claims that in analyzing this aspect of its proposal, the Agency did not give sufficient weight to "PEI's two manufacturing locations; brand new, state-of-the-art equipment; and further expansion of capital and non-capital equipment." Pl.'s MJAR at 14. Instead, PEI argues, the Agency "focused on what PEI did <u>not</u> have in terms of equipment and timing and instead focused on details that were not specified or required in the [Statement of Work]." Id.

Determinations regarding the relative weight to be assigned to particular features of offerors' proposals are within the discretion of the Agency and its experts. E.W. Bliss Co., 77 F.3d at 449. The Court cannot second guess the Agency's decision concerning which features of a proposal merit more credit and which less. Where, as here, the Agency's decision is not without a rational basis and it provides "a coherent and reasonable explanation of its exercise of discretion," the Court will not set that decision aside. Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting Impresa, 238 F.3d at 1332–33).

## 2. Disparate Treatment

PEI further argues that the assignment of this weakness reflects disparate treatment of its proposal as compared to BAE's proposal. PEI notes the Agency awarded it a weakness because if there were delays in acquiring necessary equipment, these delays could negatively impact the on-time delivery of the canisters. Pl.'s MJAR at 15. At the same time, PEI argues, the Agency "largely ignored the quality, condition, and issues even identified by BAE as 'big risks' with certain major equipment within BAE's inventory." Id. (citing AR Tab 30b at 4141).

PEI's disparate treatment argument again fails because the proposals took different approaches to the acquisition of equipment. BAE's proposal was assigned significant strengths under Element 3 "for its existing facility already set up for MK 29 production and its customized equipment and procedures purpose-designed for the MK 29 canister production already in place." AR Tab 57 at 6685. PEI's proposal did not have this attribute. See generally AR Tab 43c.

Further, the Agency found PEI's plan for ordering and installing necessary equipment problematic because of "the volume of important equipment planned but not yet in [PEI's

possession." AR Tab 57 at 6685. In contrast, BAE had all the equipment already in place, see AR Tab 30b at 4177, and its proposal included a detailed section setting forth its strategies for mitigating the risks of equipment failure. See, e.g., id. at 4151 (stating that "[a] strength of our contingency plans is that we [] already have identified major and minor [single points of failure] and have taken measures to mitigate any such occurrences").

PEI also contends that it was subjected to disparate treatment when NAVSEA "required" it to "produce term sheets and evidence of equipment purchases" yet made no similar demand of BAE. Pl.'s MJAR at 15–16 (comparing AR Tab 54 at 6623–24 with AR Tab 30b at 4183, 4209, 4135, 4140). Again, however, BAE and PEI were not similarly situated. There was no reason for the Agency to require BAE to provide confirmation that it had ordered equipment because, unlike PEI, BAE's proposal indicated it already had such equipment in place. See AR Tab 57 at 6685 (observing that "[BAE's] existing facilities, equipment and procedures provide a risk reduction above and beyond [* * *] and PEI because they are already in place"); AR Tab 30b at 4179 (stating that "[BAE] has the capacity . . . with its current tooling and equipment to complete the required maximum rate of canister production in the solicitation with a capacity reserve").

### 3.    Meaningful Discussions

PEI claims that during discussions NAVSEA did not identify any concerns about the volume and proposed timeline of equipment that PEI's proposal required it to order. PEI also contends that "[a]t no point during discussions did NAVSEA raise a timing concern or remotely suggest that PEI must have the equipment at a certain time and that, if it did not, the Agency would consider that an increased risk." Pl.'s MJAR at 28. These observations are inaccurate.

NAVSEA warned PEI at the outset of discussions that its proposal was being assigned what it then identified as a "significant weakness in the lack of details provided for the procurement and assembly of the equipment needed to manufacture, assemble and inspect the MK 29 canisters." AR Tab 31a at cell G7. The Agency noted that "[t]he combination of procurement and installations of multiple major capital equipment is a risk to meeting initial canister delivery requirements." Id. It further observed that "[i]f any of the equipment is late or there are issues with the machinery, the schedule would be negatively impacted." Id. When it requested PEI's FPR, the Agency reiterated its assessment that "PEI ha[d] a weakness in [its] approach for manufacturing" because "the combination of procurement and installations . . . of multiple major capital equipment" presented a "potential schedule risk." AR Tab 36 at 5463.

PEI's claim that the Agency did not conduct meaningful discussions about this aspect of its proposal therefore lacks merit.

### C.    Factor 1, Element 3 (Facility and Tooling): Weakness Regarding Autoclave

#### 1.    Assignment of Weakness

NAVSEA assigned PEI's proposal a second weakness under Element 3 based on its "proposed approach to mitigate a failure with the autoclave." AR Tab 54 at 6624. Like its other claims, PEI's challenge to the assignment of this weakness is unpersuasive.

PEI's proposal stated that it had a single autoclave purchased from TECHFIRST Machinery, Inc ("TECHFIRST"). AR Tab 43c at 6143–44, 6155. It intended to mitigate the risk

presented by its access to only a single autoclave by "follow[ing] in-house daily and weekly guidelines and inspections created in conjunction with TECHFIRST to keep [its] autoclave in good operating condition." Id. at 6155. In addition, PEI stated that it would employ its "in-house Preventive Maintenance [] inspection program and the guidelines on the Recommended Autoclave Periodic Maintenance Schedule," which it supplied with its proposal. Id. at 6155. The proposal also noted that TECHFIRST had "provided PEI with a recommended parts inventory list covering replacement parts that may be needed for maintenance." Id. at 6155, 6244 app. A24 (Autoclave Spare Parts List).

In its report, the SSEB noted PEI did not clearly state that the spare parts list it submitted with its proposal matched the list that TECHFIRST provided to it. AR Tab 54 at 6624. More importantly, the SSEB observed that it was unclear from PEI's proposal what equipment would be included in its "ready spares inventory" besides the HP motor and heating coils PEI specifically mentioned. Id. (quoting AR Tab 43c at 6155). The SSEB explained this lack of clarity posed a performance risk, observing that "[i]f PEI does not have the parts TECHFIRST is recommending as replacement parts that may be needed for maintenance, this may result in program delays that would impact on-time delivery in accordance with the contract." Id.

The SSAC adopted the assessment of the SSEB, but it emphasized that the biggest problem with PEI's approach to mitigating autoclave failure was its lack of a backup autoclave. See AR Tab 57 at 6676, 6685–86 (expressing concern that although an autoclave was "a critical piece of equipment to manufacture MK 29 canisters," PEI "plan[ned] to proceed with a single autoclave with no backup autoclave, as opposed to BAE and [* * *], which have backup autoclave options"). The SSAC found "the possibility of a problem with the single autoclave presents a schedule risk," and this risk would be amplified "if parts needed for repair are not immediately available." See id. at 6686.

PEI argues that in assigning its proposal this weakness under Element 3, the Agency ignored "the pristine nature of PEI's autoclave" and relied on unstated evaluation criteria. Pl.'s MJAR at 16–17. These arguments are not persuasive. Even brand new or "pristine" machinery can fail. The Solicitation contemplates that possibility by specifically requiring offerors to describe their "ability to mitigate the risk of a major equipment failure impacting schedule." AR Tab 24a at 2821. The Agency reasonably found PEI's proposal inadequate in that regard.

PEI also argues that it was an error for the Agency to assign its proposal a weakness based on the risks presented by having only a single autoclave because, according to PEI, "the autoclave was a redundancy feature." Pl.'s MJAR at 17. It contends that "[h]ad there been an unlikely breakdown of PEI's new autoclave, the secondary purchasing option through either approved source was fully available at no additional risk to on-time performance." Id.

But this argument is again the same one PEI made under Element 1, where it contended that—in the event of its inability to produce the laminate in-house—it could rely on one of the two approved sources to ameliorate any potential delays. As described above, the Agency concluded that PEI's proposal contained insufficient detail about how and when [* * *] would be able to step in to supply the laminate to ameliorate the risk, and the Court has already concluded that this assessment was a reasonable one.

### 2.    Disparate Treatment

PEI argues the Agency subjected its proposal to disparate treatment when it assigned a weakness based on the fact that it lacked an adequate plan for mitigating the failure of its single autoclave. Pl.'s MJAR at 18. It notes that the Agency did not similarly assess a weakness with respect to BAE's proposal, notwithstanding that [* * *]. See id. at 18–19.

This comparison is inapt. PEI proposed to use its single new autoclave, to follow a prescribed maintenance schedule, and, in the event of failure, to negotiate with one of the two approved sources to use their autoclave(s). [* * *]. AR Tab 30b at 4216.

The Court has considered PEI's other disparate treatment claims with respect to Element 3, including its contention that the Agency gave BAE too much credit and PEI not enough for their respective risk mitigation plans. See Pl.'s MJAR at 20. Again, PEI compares substantively distinguishable proposals. It also asks the Court to substitute its judgment for that of the Agency. The Court declines to do so, and it finds the remaining disparate treatment claims related to the autoclave without merit.

### 3.    Meaningful Discussions

PEI complains that during discussions, the Agency failed to alert it to the Agency's concerns about PEI's access to only a single autoclave. Pl.'s MJAR at 28–29. This is again inaccurate. NAVSEA stated during discussions that "PEI has a significant weakness in their proposal for its ability to mitigate major equipment failure," and it specifically mentioned the autoclave. AR Tab 31a at cell G8. This concern was repeated when the Agency requested PEI's final proposal revisions. AR Tab 36 at 5463 (observing that "PEI has a weakness in [its] proposal for [its] inability to adequately mitigate equipment failure for the autoclave").

Finally, PEI complains that "NAVSEA did not address a single question regarding specific spare parts [or] inventories" during discussions. Pl.'s MJAR at 29. But PEI only added the spare parts list in question in its final proposal after discussions had ended. See AR Tab 43d at 6312–13, 6401 app. A24 (PEI's redlined Final Proposal Revisions). Moreover, as described above, the Agency is not required during discussions to identify every part of a proposal that it finds problematic. Beyond significant weaknesses or deficiencies, it is within the contracting officer's discretion to decide which topics merit further discussions.

### D.    Factor 1, Element 5 (Program Management): Staffing Plan

### 1.    Assignment of Weakness

PEI's fourth weakness was assessed under Element 5 (Program Management). Under that Element, offerors were required to "describe [their] program management approach for staffing, subcontractor management, production planning, and communications with the Government" and "demonstrate how the Offeror's team [would] provide the resources needed to execute contract requirements." AR Tab 24a at 2822. The SSEB determined that PEI's proposal lacked sufficient detail regarding its staffing plan to demonstrate how it would provide the resources to execute the contract and that the absence of detail "jeopardize[d] performance of the contract and on-time delivery." AR Tab 54 at 6624.

For example, PEI's proposal described its plan to "ramp up its staff over the next 2-6 months" after contract award and "hire and train second shifts" within 12 months after contract award to meet delivery requirements. AR Tab 43c at 6123, 6182 tbl. 11. But its proposal did not describe "how many positions it would need to fill" "within each functional area" to staff these second shifts. AR Tab 54 at 6625 (citing AR Tab 43c at 6123–26) (noting that even though PEI described certain positions which would be assigned to shifts, it confirmed the employ and availability of only one individual). The SSAC concurred, finding PEI's proposal lacked detail "regarding its staffing approach to include the personnel within each functional area, their availability, and how many positions it would need to fill." AR Tab 57 at 6689.

PEI contends the Agency's determination was based on a misunderstanding of PEI's proposal. According to PEI, Table 4 of the proposal "clearly articulates the personnel required and available to satisfy the project." Pl.'s MJAR at 21 (citing AR Tab 43c at 6139–40 tbl. 4).[4] But Table 4 does no such thing. Entitled "Work station Process flow through the facility at North Omaha," the Table identified the number of crew members that would be required to perform each of the tasks it listed. AR Tab 43c at 6139–40 tbl. 4. But it did not indicate whether PEI currently employed the individual crew members, whether they would be available to work on the contract, or, if not, how many employees PEI would need to hire. See id. Moreover, nothing in the Table addresses the lack of detail regarding the hiring of "second shifts." See id.

PEI's proposal thus contained none of the kinds of staffing details that were provided in BAE's proposal, which the SSEB assigned a strength for its approach to Program Management. AR Tab 53 at 6611–12. The SSEB observed that BAE's staffing plan and related aspects of its proposal were "thoroughly thought out and planned" and "fully supported by credible substantiation from [BAE's] canister production history." AR Tab 53 at 6611; cf. AR Tab 30b at 4201 fig. 5-3 (providing "in place capability" of staff across required functions); id. at 4203 fig. 5-4 (leadership organizational chart); id. at 4205 fig. 5-6 (summary of staffing requirements); id. at 4216 figs. 5-14, 5-15 (labor hours analyses).

The SSEB concluded that, in contrast, "the lack of detail PEI provided regarding its staffing approach for personnel within each functional area, their availability, and how many positions it would need to fill is a flaw that presents a performance risk, which could impact on time delivery." AR Tab 54 at 6625; see also AR Tab 57 at 6688 (SSAC report noting that "PEI's lack of details for its staffing plan is a weakness that jeopardize[s] performance of the contract and on-time delivery"). The SSEB's conclusions in that regard are rationally based and supported by the record. Therefore, the Court defers to the Agency's assessment of a weakness for Factor 1, Element 5.

### 2.    Disparate Treatment

Finally, the Court is not persuaded by PEI's claim that "the very things directly assessed by NAVSEA as a weakness in PEI's proposal were awarded as a strength in BAE's proposal." Pl.'s MJAR at 21. For example, PEI observes that the Agency took it to task for not including a

---

[4] In its motion, PEI alternates between citing the "clean" and the redlined versions of Volume II of its final proposal. For consistency and clarity, the Court primarily cites the "clean" version, AR Tab 43c, and not the redlined version, AR Tab 43d.

statement regarding "whether [present employees] are available to support the project" but did not critique BAE for similarly omitting such a statement. Id. (quoting AR Tab 54 at 6624).

In fact, however, BAE's proposal did specify whether and how many of its current employees were available to work on the contract. See, e.g., AR Tab 30b at 4199 ("[* * *] skilled shop technicians and [* * *] SME engineers available at contract award."); id. at 4201 fig. 5-3 ("Staff available across all required functions."). In addition, BAE explained that personnel working on the FY19–FY23 production program would "seamlessly transition . . . to the new program with no gap in service" and that "[n]o additional staff is required to transition to production." Id. at 4202. BAE further specified that staff within certain functional areas were available to work on the contract. See, e.g., id. at 4182 & fig. 3-12, fig. 3-13 ("All required test personnel are in place and supporting current VLS canister programs."); id. at 4183 ("[* * *] of the [* * *] [engineering support personnel] are primarily assigned to the current Mk 41 VLS Canister Production Program."). And BAE specified several areas for which it would need to engage in additional hiring. See id. at 4203–05 & fig. 5-6.

### 3.    Misleading Discussions

Finally, PEI contends that the Agency engaged in misleading discussions regarding the weakness it assigned PEI based on the lack of details in its staffing plan. Pl.'s MJAR at 29–30. But PEI also acknowledges that it "reasonably understood from the[] [discussion] questions that it needed to provide details about its workforce and staffing plan." Id. at 29. Indeed, the spreadsheet the Agency provided to PEI addressed the weakness of its staffing plan in detail, asking among other things, that PEI "demonstrate that the quantity of staff is sufficient to execute the production to the delivery rates and schedule as required," that it "address the lack of names and specific work experience of staff members who are 'ready and immediately available,'" and that it "elaborate on if a 2 shift operation with 6 production personnel required per shift' are already supporting PEI or will need to be hired and trained." AR Tab 31a at cells G5, H5. The Court therefore rejects PEI's meaningful discussions argument.

## IV.    The Adjectival Ratings

In addition to contesting its four assigned weaknesses, PEI argues the adjectival ratings it received—"Marginal" under Factor 1 and "Moderate" risk overall—were unreasonable, arbitrary, and capricious. Pl.'s MJAR at 22–25. It claims the Navy should have assigned its proposal "Outstanding" and Low Risk ratings instead. Id. at 25. This argument is derivative of its challenges to the assigned weaknesses, which the Court has found without merit.

An "Outstanding" rating is reserved for proposals that "demonstrate[] an exceptional approach and understanding of the requirements" and that "contain[] multiple strengths and/or at least one significant strength." AR Tab 24a at 2831 tbl. M-1. To be sure, PEI's proposal received three strengths. AR Tab 57 at 6677. But it was also assigned four weaknesses. Id. Each weakness reflects the existence of "a flaw in the proposal that increases the risk of unsuccessful contract performance." AR Tab 24a at 2833 (citing FAR 15.001). Given that PEI's proposal received four weaknesses, the Agency reasonably concluded that PEI's proposal did not demonstrate an "exceptional approach and understanding of the requirements." AR Tab 57 at 6690.

Moreover, a "Marginal" rating is appropriate when a "[p]roposal has not demonstrated an adequate approach and understanding of the requirements." AR Tab 24a at 2831 tbl. M-1. According to PEI, "[n]othing in [its] proposal demonstrates that it fails to understand the requirements," so the proposal merited a higher than "Marginal" rating. Pl.'s MJAR at 24.

But PEI's argument is based on its own view of its proposal's merits. It depends on the Court agreeing with its contention that the weaknesses the Agency assigned were not justified. The record makes clear that the Agency decided PEI's proposal lacked sufficient assurances regarding several matters essential to the on-time delivery of the canisters. AR Tab 54 at 6622–25. For instance, the Agency thought PEI failed to appreciate either the risks presented by its decision to manufacture the laminate in-house or the importance of having solid commitments with an approved source or sources of the laminate. Id. at 6622. The Agency had similar concerns with respect to PEI's failure to secure a backup plan in the event of autoclave failure, as well as what the Agency viewed as a lack of urgency in ordering equipment. Id. at 6624. Further, the Solicitation stated that a proposal was "not required to have all of the attributes of the rating definitions . . . to be eligible for the rating adjective specified." AR Tab 24a at 2831. PEI's objection to the implied characterization that it "has not demonstrated an adequate . . . understanding" is misguided. Id. at 2831 tbl. M-1.

For similar reasons, there is no merit to PEI's contention that the Agency engaged in arbitrary and capricious decision making when it evaluated PEI's proposal as "Moderate" rather than "Low" risk. See Pl.'s MJAR at 23. A "Low" risk proposal "may contain weakness/weaknesses which have low potential to cause disruption of schedule, increased cost, or degradation of performance." AR Tab 24a at 2832 tbl. M-2. A "Moderate" risk proposal "contains a significant weakness or combination of weaknesses which may have a moderate potential to cause disruption of schedule, increased cost, or degradation of performance." Id. It was not irrational for the Agency to conclude that the combination of four weaknesses it had identified had a moderate potential to cause these adverse consequences.

## V.    Remaining Arguments

Finally, PEI contends the Agency "improperly converted this procurement into a de facto sole source acquisition." Pl.'s MJAR at 30–35. It also challenges the Agency's best value determination. Id. at 35–36. Both arguments are derivative of the challenges PEI posed to the weaknesses and adjectival ratings assigned to its proposal. Because the Court has rejected those challenges, it must necessarily reject PEI's contentions that its proposal deserved higher ratings and represented a better value than BAE's proposal.

## <u>CONCLUSION</u>

For the reasons set forth above, in a September 30, 2025 Order, the Court denied PEI's Motion for Judgment on the Administrative Record, ECF No. 37, and granted the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 45, and BAE's Cross-Motion for Judgment on the Administrative Record, ECF No. 44. Order, ECF No. 52. It now directs the Clerk to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge
